AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

2-28-06

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| vs. | |
| DARIUSZ STANLEY BARANSKI | CASE NUMBER: 3:06-mj- 1065 TEM |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  Between in or about April 2005 and in or about September 2005, in Duval County, in the Middle District of Florida and elsewhere, the defendant did,

> conspire and agree to assist individuals to enter into fraudulent marriages for the purpose of evading a provision of the immigration laws of the United States and conspire and agree to assist individuals to present to the Naval Service of the United States claims against the United States Navy, knowing such claims to be fraudulent,

in violation of Title 8, United States Code, Section 1325(c), all in violation of Title 18, United States Code, Section 371 and in violation of Title 18, United States Code, Section 287, all in violation of Title 18, United States Code, Section 371.  I further state that I am a(n) Special Agent with Immigration and Customs Enforcement, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes  ☐ No

_____
Signature of Complainant
DONALD WELLS

Sworn to before me and subscribed in my presence,

February 28, 2006                    at       Jacksonville, Florida

THOMAS E. MORRIS
United States Magistrate Judge            _____
Name & Title of Judicial Officer            Signature of Judicial Officer

CRIMINAL COMPLAINT AFFIDAVIT

Your affiant, Donald Wells, being a duly sworn and appointed Special Agent of the United States Immigration and Customs Enforcement (ICE), formerly known as the Immigration and Naturalization Service, and the United States Customs Service, hereby makes the following statement in support of the attached criminal complaint.

1. Your affiant is a Special Agent of ICE and has been in the federal law enforcement service for three years, initially as a Customs Inspector and later as a Special Agent. Your affiant has training and experience in the preparation, presentation and service of criminal complaints and arrest warrants.

2. On February 9, 2006, Naval Criminal Investigative Service (NCIS) Special Agent Matthew J. Lascell told your affiant the following:

   a. That in or about late September 2005, he (Lascell) was assigned to the USS JOHN F. KENNEDY (CV-67) (JFK), which was involved in training exercises off the coast of Florida.

   b. That he (Lascell) was approached by a Chief Petty Officer who told him that Petty Officer Ryan Dodge entered into a fraudulent marriage to a Polish woman and was going to apply for Basic Allowance for Housing (BAH), which is additional money military personnel get to help support their spouses and children and is based on rank, number of dependants and location of the spouse and children.

   c. That in or about September 2005, he (Lascell) ran a Navy computer check and determined that a petty officer named Ryan Dodge was assigned to the JFK

and after determining that Dodge was on board the JFK, sent a Navy Master at Arms to bring Dodge to his office.

    d.    That when Dodge arrived, he (Dodge) was questioned about his marital status and whether he (Dodge) intended to apply for BAH. Dodge told him (Lascell) the following:

    1.    That in July 2005, he (Dodge) spoke to a JFK airman named Mandy Denker about how he (Dodge) wished he (Dodge) were married so he (Dodge) could receive additional BAH pay.

    2.    That Denker told him (Dodge) she had a friend named Isaac Bell, a sailor assigned to the JFK, that could arrange a fraudulent marriage so that he (Dodge) could receive the extra BAH pay.

    3.    That approximately two weeks later, he (dodge) approached Bell, discussed the circumstances surrounding entering into a fraudulent marriage, later agreed to enter into a fraudulent marriage and was told by Bell that he (Dodge) would be contacted when the woman he (Dodge) was to marry was available.

    4.    That on September 6, 2005, he (Dodge) met Bell and Denker at an apartment they share in Jacksonville, Florida along with Joe Conn, a sailor assigned to the JFK and that after the meeting, he (Dodge), Bell and Denker went to the Durango Restaurant at the corner of Atlantic and Hodges Boulevard where Bell introduced him (Dodge) to a female Polish citizen named Edyta Sadowska and to his (Bell's) Polish wife, later identified as Katarzyna Sledz Bell.

    5.    That September 7, 2005, he (Dodge) married Sadowska in Kingsland, Georgia, that after the ceremony he (Dodge) took her (Sadowska) to

Mayport Naval Station, obtained a military identification card for her (Sadowska) based on the fraudulent marriage, that after obtaining the military identification card, she (Sadowska) returned to a suburb of Chicago, Illinois, where she lives, that he (Dodge) has not seen her (Sadowska) since that day, never lived with her (Sadowska) and the marriage was never consummated and that the discussions mentioned in paragraphs 2d1 through 2d4 took place in Jacksonville, Florida.

  e. That on October 18, 2005, Dodge made a recorded telephone call to Bell in which he (Dodge) attempted to withdraw from the marriage and that during the telephone call, Bell told him (Dodge) the following:

    1. That it would cost him (Dodge) $5,000 to withdraw from the marriage.

    2. That if he did so, he (Dodge) would be putting Sadowska in a bad spot, that she (Sadowska) would never be able to stay in the United States and would be forced to leave the country.

  f. That on October 21, 2005, Bell, a sailor assigned to the JFK, came by his (Lascell) office aboard the JFK. Bell was advised of his Military Suspect's Acknowledgment and Cleansing Waiver of Rights and agreed to make a statement without an attorney present. During the statement, Bell told him (Lascell) the following:

    1. That on or about April 5, 2005, Petty Officer Conn told him (Bell) that he (Conn) met a Polish sailor he (Conn) knew as Derek, later identified as Dariusz Stanley Baranski, assigned to the USS SIMPSON (FFG-56) (SIMPSON) who told him (Conn) that he (Baranski) could arrange a marriage so that Conn could collect BAH for a high cost of living area, that on April 29, 2005, Conn married a Polish citizen

3

named Agnieszka M. Nowak and that Nowak paid Baranski $6,000 for his (Baranski) help in arranging the marriage.

2. That he (Bell) decided to enter into a fraudulent marriage to receive BAH, that originally Baranski arranged for him (Bell) to marry a Polish citizen who was one of Agnieszka Nowak's friends, that the marriage fell through, that Baranski introduced him (Bell) to two Polish women named Katarzyna Sledz and Iwona Antoniak and that Baranski refused to arrange a marriage to either woman because they did not have the money he (Baranski) required to arrange marriages.

3. That he (Bell), Baranski and Sledz ultimately agreed that he (Bell) would marry Sledz if she (Sledz) paid Baranski $2,000, that on June 13, 2005, in Jacksonville, Florida, he (Bell) married Sledz, that Bell continued to live with Denker and Sledz lived with Conn's wife, Agnieszka Nowak, at a residence in Jacksonville, Florida and that the discussions concerning the fraudulent marriage between Bell and Sledz took place in Jacksonville, Florida.

4. That on June 27, 2005, in Jacksonville, Florida, Antoniak entered into a fraudulent marriage to Airman Isidro Cruz, stationed on the JFK so Cruz could receive BAH.

5. That he (Bell) and Conn decided to go into business for themselves and arrange marriages so that other sailors could receive BAH based on fraudulent marriages, that they (Bell and Conn) found several willing sailors, including Horatioalexander King and Gregory Allen Mitchell, that he (Bell) and Conn could not find Polish wives for those sailors, that they (Bell and Conn) ultimately referred them to Baranski who paid him (Bell) and Conn $500 each as a finder's fee and arranged for

King to enter into a fraudulent marriage to a Polish citizen named Katarzyna Elzbieta Madej on June 24, 2005 and for Mitchell to enter into a fraudulent marriage to a Romanian citizen named Mariana Gina Carati on June 30, 2005 and that Baranski was able to provide King and Mitchell notarized copies of leases from high cost of living areas which would result in higher BAH payments.

      6.    That in August 2005, Dodge approached Bell and asked him (Bell) to arrange a fraudulent marriage to a Polish woman so he (Bell) could get BAH, although Bell lived with Denker, Katarzyna SLEDZ, the Polish citizen he (Bell) fraudulently married, introduced Dodge to Sadowska who he (Dodge) married on September 7, 2005, Sadowska paid Bell $4,000 to arrange the marriage and the money was split between Bell, Conn, Sledz and Antoniak.

      g.    That on October 20, 2005, he (Lascell) interviewed Conn, that prior to the interview, he (Lascell) advised him (Conn) of his Military Suspect's Acknowledgment and Waiver of Rights, that Conn stated that he (Conn) met Bell in March 2005, that Bell arranged for him (Conn) to enter into a fraudulent marriage to a Polish woman named Agnieszka Nowak, that he (Conn) married Nowak on April 29, 2005 in Jacksonville, Florida, that he (Conn) never lived with Nowak and that following the ceremony, she (Nowak) returned to New York, that although he (Conn) claimed the marriage was consummated, he (Conn) entered into the marriage solely so that he (Conn) could obtain BAH and that the discussions regarding Conn's fraudulent marriage to Nowak took place in Jacksonville, Florida.

      h.    That on October 26, 2005, after interviewing Bell, he (Lascell) re-interviewed Conn, that during the interview, Conn re-affirmed the information he (Conn)

had provided on October 20, 2005 except that he (Conn) stated that Baranski arranged the marriage, that Nowak paid Baranski $6,000 to arrange the marriage, that he (Conn) arranged Mitchell's marriage to Carati through Baranski, that Baranski paid him an $800 "finder's fee", that Bell arranged the marriage through Baranski between King and a Polish citizen named Madej, that he (Conn) thinks Baranski paid Bell $800 as a "finder's fee", that he (Conn) and Bell arranged the marriage between Cruz and Antoniak and the marriage between Dodge and Sadowska, that both marriages were arranged through Sledz, that Antoniak paid him (Conn) and Bell $500 each to arrange the marriage, that Sadowska paid $4,000 to arrange the marriage, which was distributed as described in paragraph 2f6 and that Baranski threatened to hurt him (Conn) if he (Conn) ever disclosed the fraudulent marriage scheme.

   i. That on October 20, 2005, he (Lascell) interviewed King, that prior to the interview King was advised of his (King's) Military Suspect's Acknowledgment and Waiver of Rights, that King claimed that his (King's) marriage to Madej was legitimate, that he (King) met Madej during Fleet Week in or about April of 2005 in New York City, that he (King) married MADEJ on June 24, 2005 in Jacksonville, Florida, that he (King) has only seen her (Madej) a couple of times, that she (Madej) lives in New York and he (King) lives in Jacksonville, Florida, that aside from his (King's) sister, he (King) has never told anyone in his (King's) family about the marriage and that he (King) has never met Madej's family.

   j. That on October 25, 2005, he (Lascell) interviewed Cruz, that prior to the interview, Cruz was advised of his (Cruz's) Military Suspect's Acknowledgment and Waiver of Rights and that Cruz told him (Lascell) the following:

       1.    That in or about May 2005, Bell told him (Cruz) that he (Bell) could arrange a marriage between him (Cruz) and a Polish citizen and that based on the marriage, he (Cruz) could collect BAH.

       2.    That the Polish citizen could use the marriage to obtain United States citizenship and that he (Cruz) would be under no financial obligation to support her.

       3.    That it would be a marriage of convenience and that if he (Cruz) was interested in the arrangement, Bell would need a copy of his (Cruz's) birth certificate, leave and earning statement, 2004 W-2 and Navy enlistment contract.

       4.    That on June 22, 2005, he (Cruz) met Antoniak, married her (Antoniak) in Jacksonville, Florida and that Sledz was present and took pictures of the ceremony.

       5.    That one or two weeks later, he (Cruz) took her (Antoniak) on board Naval Station (NS) Mayport and got her (Antoniak) a military identification card.

       6.    That he (Cruz) never lived with Antoniak, has spoken to her (Antoniak) on the phone on a couple of occasions and that he (Cruz) has not seen her (Antoniak) since the ceremony.

       k.    That on December 23, 2005, he (Lascell) received a report of an interview of Mitchell conducted by NCIS Special Agent Michael Lofton, that prior to the interview, Mitchell was advised of his (Mitchell's) Military Suspect's Acknowledgment and Waiver of Rights and that Mitchell told Agent Loften the following:

1. That in or about June 2005, while he (Mitchell) was stationed on the JFK, he (Mitchell) was approached by Conn who told him (Mitchell) that he (Conn) could arrange a marriage between him (Mitchell) and a Polish citizen and that based on the marriage, he (Mitchell) could collect BAH.

2. That the Polish citizen who lived in New York could use the marriage to obtain United States citizenship and that he (Mitchell) would be under no financial obligation to support her because she was financially secure.

3. That approximately a week later, Conn met with him (Mitchell) again, placed a phone call to a Romanian citizen named Carati and put her on the telephone with him (Mitchell). During the phone conversation, Carati told him (Mitchell) the following:

    a. That she (Carati) is a Romanian citizen already involved in a relationship with a man but that she (Carati) needs to marry an American to obtain United States citizenship and remain in the United States.

    b. That she (Carati) and her boyfriend, who she (Carati) identified as Didi, were planning to fly from New York to Jacksonville, Florida on June 30, 2005.

    c. That she (Carati) described herself as a white female wearing a white tank top and blue jeans and that she would be with Didi.

4. That on June 30, 2005, he (Mitchell) and Conn went to Jacksonville International Airport (JIA), picked up Carati and Didi.

5. That Conn drove Carati, Didi and himself (Mitchell) to the courthouse in Jacksonville, Florida where they (Mitchell and Carati) attempted to get married but were advised that they (Mitchell and Carati) could not marry for three days.

6. That Conn then drove Carati, Didi and himself (Mitchell) to a chapel in Kingsland, Georgia where they were married.

7. That he (Mitchell) never lived with Carati and has not seen her (Carati) since the ceremony.

8. That based on the fraudulent marriage to Carati, he (Mitchell) receives $1,836 for BAH and an additional $200 for separation pay.

9. That the discussions and actions mentioned in paragraphs 2k1 through 2k5 took place in Jacksonville, Florida.

l. That on or about February 13, 2006, he (Lascell) determined that in 2006, Mitchell took Carati to Naval Station Mayport and obtained a military dependant identification card.

m. That on November 21, 2005, NCIS Special Agent Tina Grant told him (Lascell) that on that day, she (Grant) interviewed Petty Officer Anthony Palacios, that prior to the interview, Palacios was advised of his (Palacios's) Military Suspect's Acknowledgment and Waiver of Rights and that Palacios made the following statement:

1. That in June 2005, he (Palacios) was approached by Baranski who told him (Palacios) that Baranski could arrange a marriage between him (Palacios) and a Polish citizen, that based on the marriage, he (Palacios) could obtain BAH, that the discussions concerning arranging the fraudulent marriage took place in Jacksonville, Florida.

9

2. That approximately two weeks later, Baranski introduced him (Palacios) to Sylwia Trzcinska at Baranski's apartment at 653 Monument Road, Apartment 107, Jacksonville, Florida and that Baranski told him (Palacios) Trzcinska wanted to marry a Navy sailor so she (Trzcinska) could obtain military health benefits.

3. That on June 27, 2005, Baranski arranged for him (Palacios) to meet Trzcinska at the courthouse in Jacksonville, Florida where they (Palacios and Trzcinska) were married.

4. That approximately one week later, he (Palacios) took her (Trzcinska) to Naval Station Mayport, obtained a military dependant identification card for her (Trzcinska) and obtained TriCare military health insurance.

5. That Trzcinska was then living with Baranski and never lived with him (Palacios).

n. That on November 21, 2005, NCIS Special Agent Greg Norton told me (Lascell) that on that day, he (Norton) interviewed Seaman Timothy Richard McNomee, a sailor stationed on the SIMPSON, that prior to the interview, McNomee was advised of his (McNomee's) Military Suspect's Acknowledgment and Waiver of Rights and that McNomee made the following statement:

1. That in December 2004, he (McNomee) was introduced to a Polish citizen named Monika Kubaczka who told him (McNomee) that she (Kubaczka) was in the United States on a work visa which was about to expire and that she (Kubaczka) needed to marry an American so she (Kubaczka) could stay in the United States, that if he (McNomee) married her (Kubaczka), he (McNomee) could obtain BAH,

10

that she (Kubaczka) did not expect him (McNomee) to support her (Kubaczka) or live with her (Kubaczka).

    2.    That on March 4, 2005, he (McNomee) met her (Kubaczka) at the courthouse in Jacksonville, Florida where they (McNomee and Kubaczka) were married.

    3.    That later he (McNomee) took her (Kubaczka) to Naval Station Mayport, obtained a military dependant identification card for her (Kubaczka) and obtained TriCare military health insurance.

    4.    That he (McNomee) collected BAH pay based on his (McNomee) fraudulent marriage to Kubaczka.

    o.    That he (Lascell) conducted computer records checks and determined the following:

    1.    That on or about June 13, 2005, Bell started to receive BAH pay based on his (Bell's) fraudulent marriage to Sledz and received approximately $5,230.52 until his (Bell's) BAH pay was terminated on November 30, 2005. The application for BAH was submitted to the Navy from the JFK, which is home ported at Mayport Naval Station, Jacksonville, Florida.

    2.    That on or about April 27, 2005, Conn started to receive BAH pay based on his (Conn's) fraudulent marriage to Nowak and received approximately $13,236.78 until his (Conn's) BAH pay was terminated on November 30, 2005. The application for BAH was submitted to the Navy from the JFK, which is home ported at Mayport Naval Station, Jacksonville, Florida.

3.  That on or about December 30, 2004, Baranski started to receive BAH pay based on his (Baranski's) marriage to Magdalena Joanna Koryzma and received approximately $23,512 although he (Baranski) was not supporting Koryzma and was in fact living with Trzcinska at his (Baranski's) apartment at 653 Monument Road, Apartment 107, Jacksonville, Florida. The application for BAH was submitted to the Navy from the USS SIMPSON, which is home ported at Mayport Naval Station, Jacksonville, Florida.

4.  That on or about June 24, 2005, King started to receive BAH pay based on his (King's) fraudulent marriage to Madej and received approximately $9,802.08 until his (King's) BAH pay was terminated on November 30, 2005. The application for BAH was submitted to the Navy from the JFK, which is home ported at Mayport Naval Station, Jacksonville, Florida.

5.  That on or about June 30, 2005, Mitchell started to receive BAH pay based on his (Mitchell's) fraudulent marriage to Carati and has received approximately $15,275 as of February 28, 2006. The application for BAH was submitted to the Navy from the JFK, which is home ported at Mayport Naval Station, Jacksonville, Florida.

6.  That on or about June 27, 2005, Cruz started to receive BAH pay based on his (Cruz's) fraudulent marriage to Antoniak and received approximately $4,794.56 until his (Cruz's) BAH pay was terminated on November 30, 2005. The application for BAH was submitted to the Navy from the JFK, which is home ported at Mayport Naval Station, Jacksonville, Florida.

7.  That on or about August 19, 2004, Palacios started to receive BAH pay based on his (Palacios') fraudulent marriage to Trzcinska and has received approximately $16,682 as of February 28, 2006. The application for BAH was submitted to the Navy from the USS SIMPSON, which is home ported at Mayport Naval Station, Jacksonville, Florida.

8.  That on or about March 14, 2005, McNomee started to receive BAH pay based on his (McNomee's) fraudulent marriage to Kubaczka and received approximately $8,496 until his (McNomee's) BAH pay was terminated on December 16, 2005. The application for BAH was submitted to the Navy from the USS SIMPSON, which is home ported at Mayport Naval Station, Jacksonville, Florida.

3.  On February 14, 2006, your affiant had Immigration Service computer checks run and determined the following:

a.  That Sadowska entered the United States on a B-2 tourist visa on January 11, 2003, was authorized to remain in the United States until July 11, 2003. Your affiant has been unable to locate an Immigration Service record that Sadowska has filed a petition to become a conditional resident alien based on her (Sadowska) fraudulent marriage to Dodge.

b.  That Sledz entered the United States on a B-2 tourist visa on April 8, 2004, was authorized to remain in the United States until October 7, 2004. Your affiant has been unable to locate an Immigration Service record that Sledz has filed a petition to become a conditional resident alien based on her (Sledz) fraudulent marriage to Bell.

c. That your affiant was unable to find a record that Antoniak was ever lawfully admitted into the United States and as a result, apparently entered the United States without inspection by the Immigration Service. Your affiant has been unable to locate an Immigration Service record that Antoniak has filed a petition to become a conditional resident alien based on her(Antoniak's) fraudulent marriage to Cruz.

d. That Madej entered the United States on a B-1 visa on July 23, 2001, was authorized to remain in the United States until January 22, 2002 and that on August 28, 2005, she (Madej) filed a petition to become a conditional resident alien based on her (Madej's) fraudulent marriage to King.

e. That Carati entered the United States on a B-2 tourist visa on October 27, 2000, was authorized to remain in the United States until April 11, 2001 and that on July 14, 2005, she (Carati) filed a petition to become a conditional resident alien based on her (Carati's) fraudulent marriage to Mitchell.

f. That Nowak entered the United States on a J-1 visa on June 30, 2001, was authorized to remain in the United States until the expiration of the government-sponsored program upon which she (Nowak) was allowed entrance into the United States and that on July 4, 2005, she (Nowak) filed a petition to become a conditional resident alien based on her (Nowak's) fraudulent marriage to Conn.

g. That Trzcinska entered the United States on a J-1 visa on June 25, 2004, was authorized to remain in the United States until the expiration of the government-sponsored program upon which she (Trzcinska) was allowed entrance into the United States. Your affiant has been unable to locate an Immigration Service record

that Trzcinska has filed a petition to become a conditional resident alien based on her (Trzcinska's) fraudulent marriage to Palacios.

    h.    That Kubaczka entered the United States on a J-1 visa on March 31, 2003, was authorized to remain in the United States until the expiration of the government-sponsored program upon which she (Kubaczka) was allowed entrance into the United States and that on May 2, 2005, she (Kubaczka) filed a petition to become a conditional resident alien based on her (Kubaczka's) fraudulent marriage to McNomee. Kubaczka's petition to adjust her (Kubaczka) immigration status based on her (Kubaczka's) fraudulent marriage to McNomee was denied after she (Kubaczka) and McNomee failed to appear for an interview to determine the validity of the marriage.

Based on the foregoing information, your affiant believes that there is probable cause to believe that between in or about April 2005 and September 2005, Dariusz Stanley BARANSKI, Joe CONN, Agnieszka Marta NOWAK, Isaac BELL, Katarzyna SLEDZ, Horatioalexander KING, Katarzyna Elzbieta MADEJ, Isidro CRUZ, III, Iwona ANTONIAK, Gregory MITCHELL, Mariana CARATI, Anthony Niele PALACIOS, Sylwia TRZCINSKA, Ryan Timothy DODGE and Edyta SADOWSKA conspired and agreed to enter into fraudulent marriages for the purpose of evading a provision of the immigration laws of the United States in violation of Title 8, United States Code, Section 1325(c), all in violation of Title 18, United States Code, Section 371, that Timothy Richard MCNOMEE and Monika Agnieszka KUBACZKA entered into a marriage for the purpose of evading a provision of the immigration laws of the United States, in violation of Title 8, United States Code, Section 1325(c) and that between on or about December 30, 2004 and on or about June 27, 2005, Dariusz Stanley BARANSKI, Joe CONN,

15

Isaac BELL, Horatioalexander KING, Isidro CRUZ, III, Gregory MITCHELL and Anthony Niele PALACIOS presented to the Naval Service of the United States a claim against the United States Navy, knowing such claim to be fraudulent, in violation of Title 18, United States Code, Section 287, all in violation of Title 18, United States Code, Section 371, and that Timothy Richard MCNOMEE presented to the Naval Service of the United States a claim against the United States Navy, knowing such claim to be fraudulent, in violation of Title 18, United States Code, Section 287.

_____
Donald J. Wells, Special Agent
United States Immigration and Customs Enforcement
Jacksonville, Florida